No. 2875

Second Circuit

----

McEACHERN v. PINE WOOD LBR. CO., LTD.

----

(Feb. 24, 1927.   Opinion and Decree.)

----

(*Syllabus by the Court*)

1. **Louisiana Digest—Master and Servant— Par. 160 (j).**

An employer seeking to escape liability under the Workmen's Compensation Act for an injury suffered by his employee on the ground that at the time of the accident causing the injury, the employee's services had been transferred to a new master, must show that the employee had consented to the change of masters and had submitted himself to the control of the new employer.
Erie Ry. Co. vs. Jackson, 91 Atl. 1035.

2. **Louisiana Digest—Master and Servant— Par. 154, 159, 160 (i).**

Where the usefulness of a physical function of the employee was seriously, permanently impaired and he is thereby temporarily totally disabled to do work of a reasonable character, the fact that he might have recovered compensation under clause (a) of subsection 1 of section 8 of the Employers' Liability Act as for temporary total disability will not preclude him from recovering compensation under clause (e) of the same subsection of the act as for serious, permanent impairment of a physical function.
Matthew Burton vs. Kaucher, Hodges & Co., 3 La. App. 74.
(The recent amendment of Act 20 of 1914 is Act 85 of 1926.   Editor's note.)

Appeal from the Second Judicial District Court of Louisiana, Parish of Webster. Hon. John S. Richardson, Judge.

Action by Leonidas L. McEachern against Pine Wood Lumber Company, Ltd.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

T. H. McEachern, of Homer, and Clifford E. Hays, of Minden, attorneys for plaintiff, appellee.

White, Holloman & White, of Alexandria, attorneys for defendant, appellant.

REYNOLDS, J.   This is a suit under the Employers' Liability Act to recover compensation for four ribs broken and medical expenses incurred.

Plaintiff alleged that while in the employ of defendant and being transported from his home to his work in an automobile owned and operated by it, he was thrown from the automobile to the ground and thereby sustained a fracture of six ribs on his left side toward the rear; that he was thereby temporarily totally dis-

abled for nine weeks and his back and left side seriously, permanently impaired.

He also alleged that in consequence of the injury he had been compelled to incur medical expenses to the amount of $132.13.

He alleged that at the time of the accident he was earning $3.00 per day or $18.00 per week.

He prayed for judgment for the amount of the medical expenses and for 65 per cent of the wages he had been earning for 100 weeks with interest and costs.

Defendant denied that at the time of the accident plaintiff was in its employ and alleged that he had previously left its employ and entered that of one J. F. Giles.

It is admitted that the automobile from which plaintiff fell was its property, but alleged that at the time it had been borrowed for the use of J. F. Giles and was not being operated by defendant's servants.

On these issues the case was tried and there was judgment in favor of plaintiff for $132.13 medical expenses and compensation at the rate of $11.70 per week for 100 weeks with legal interest on each payment from the time it became due and all costs and defendant appealed.

### OPINION

The first question to be determined is, was the plaintiff in the employ of the Pine Woods Lumber Company, Ltd., at the time of the accident or in that of J. F. Giles.

Plaintiff testified, pages 10, 13, 14, 15, 19, 21, 22, 23, 24, 25:

"Q. Well, whose car was this that you were riding in?

"A. I suppose it was the Pine Woods Lumber Company.

"Q. Who were you working for at that time?

"A. I was working of the company.

"Q. What company?

"A. Pine Woods Lumber Company.

"Q. What kind of work were you doing?

"A. Repair work.

"Q. Well, was that carpenter work or—

"A. (Interrupting) Yes, sir; carpenter work.

"Q. Had you recently been working on the mill shed at Springhill any time just previous to this accident?

"A. Yes, sir.

\* \* \*

"Q. What kind of work have you done since this accident?

"A. I have been working in a store for Mr. M. T. Brown at Springhill.

"Q. Does it pain you to do any strenuous work of any kind?

"A. Well, heavy lifting or something like that it hurts me.

"Q. Now, the day that this accident occurred, who was driving the truck?

"A. Mr. McDonald.

"Q. Was he employed by the Pine Woods Lumber Company?

"A. I suppose he was, yes, sir.

"Q. Had it been their custom to carry you all into your work and bring you back?

"A. Yes, sir.

"Q. And as I understand, you were going out to this job to work in this truck at the time?

"A. Yes, sir.

"Q. I will ask you how did they pay you for your work, whether it was by check or money?

"A. Why they paid by money in an envelope. I may have one in my pocket. Something like that. (Witness hands envelope to counsel.)

"Q. They put the money in an envelope and paid you?

"A. Yes, sir.

"Q. Where did you get this pay?

"A. I got it from the Pine Woods Lumber Company's office.

"Q. There in Springhill?

"A. Yes, sir.

"Q. I will offer you a document marked

P-3 for identification and I will ask you to state what it is?

"A. State what this is?

"Q. Yes.

"A. Why this here is the envelope that they use to pay off hands with; put money in it and pay off hands with, with the company's name above and the name of the person that it belongs to below and the amount and the date.

\* \* \*

"Q. Did you receive that document marked P-3 from the Pine Woods Lumber Company's office?

"A. Yes, sir.

"Q. When did you get that?

"A. I got this—well it states 8-31-1925.

"A. Was that after you were hurt?

"A. Yes, sir.

"Q. Well, for what work did you get this money that was in this envelope? What was it paid for?

"A. It was the last work that I did for the company.

\* \* \*

"Q. Where were you going to work?

"A. We were going out there on the house.

"Q. Whose house was that?

"A. Pine Woods Lumber Company, I suppose.

\* \* \*

"Q. Where was this house you were working on; how far from town?

"A. It must have been something like one mile and a half or three-quarters, something like that.

\* \* \*

"Q. Where did you say that you are working now?

"A. Mr. Brown's; M. T. Brown.

"Q. What does he do?

"A. He has got a mercantile business.

"Q. What are you, a clerk in the store?

"A. Yes, sir.

\* \* \*

"Q. What are you getting from Mr. Brown?

"A. What am I getting?

"Q. Yes. Answer the question.

"A. Well, he is just paying me sixty dollars ($60.00) per month.

"Q. Sixty dollars ($60.00) per month?

"A. Yes, sir.

"Q. Does he give you any concessions of any kind?

"A. Any which?

"Q. Does he let you buy groceries there at cost?

"A. Yes, sir.

"Q. When was it that you started to work there?

"A. Last October. I started there the first of last October.

\* \* \*

"Q. You get stuff at cost. Now, how much do you save over what you would spend if you bought elsewhere?

"A. Well, I reckon twelve dollars ($12.00) or fifteen dollars ($15.00) per month saving on what I buy.

\* \* \*

"Q. Mr. McEachern, who hired you to work for the Pine Woods Lumber Company?

"A. Mr. Dean; D. A. Dean.

"Q. Was he employed by Pine Woods Lumber Company?

"A. Well, I guess so. I don't know, I guess so, guess he is.

"Q. He has charge as foreman of the carpentering around the mill, hasn't he?

"A. Yes, sir.

\* \* \*

"Q. Before you started on this house, where were you working?

"A. We were putting up a building right there in town.

"Q. Company building?

"A. Yes, sir.

"Q. In the quarters?

"A. Yes, sir.

"Q. Mr. Dean had charge of you all when you were out on this house where you were going when you got hurt, did he not?

"A. Well, he went with us out there on the job and told us what he wanted done.

"Q. You all worked under instructions from Mr. Dean?

"A. Yes, sir.

"Q. And also when you were working there on the mill—on the houses at the mill—you were working under instructions of Mr. Dean?

"A. Yes, sir.

\* \* \*

"Q. Mr. McEachern, it has been testified to here that you were told that this house was the property of Mr. J. F. Giles, that there was no policy. Do you remem-

ber any such statement being made to you?

"A. No, sir, I don't remember any such statement.

* * *

"Q. I will ask you who you were working for, Mr. McEachern?

"A. I was working for the Pine Woods Lumber Company."

J. T. McEachern testified, pages 38 and 39:

"Q. Whose house was that?

"A. Mr. Giles or the company's.

"Q. It was Mr. Giles' house, was it not?

"A. I don't know whether it was; it was the company's land.

* * *

"Q. Whom did you understand that you were working for?

"A. Mr. D. A. Dean hired me and he was working for the company.

"Q. Pine Woods Lumber Company?

"A. Yes, sir.

"Q. And your understanding was that you were employed by the Pine Woods Lumber Company?

"A. Yes, sir."

Will White testified, pages 40, 41, 42:

"Q. Where were you living during August, 1925?

"A. Springhill.

"Q. What were you doing at that time?

"A. I was working for the company.

* * *

"Q. Who were you working under?

"A. Mr. Dean.

* * *

"Q. Who employed you to work out on this house where Mr. McEachern was working and where he was going to when he got hurt?

"A. Well, I guess Mr. Dean did.

"Q. Well, don't you know that he did?

"A. Well, I was working for the company when he went to work for the company.

"Q. You were working for them then when he went to work for them as foreman?

"A. Yes, sir.

"Q. Who transferred you to this house there in town?

"A. Mr. Dean.

* * *

"Q. Mr. White, when you were working on this house with Mr. McEachern—I mean that Mr. McEachern, was going to when he got hurt—did you receive any orders from him as to what to do, as foreman?

"A. No, sir.

"Q. Who was foreman on the job?

"A. Mr. Dean."

D. A. Dean testified, pages 44, 47, 48, 51, 52, 53, 54, 55, 58:

"Q. Where do you live, Mr. Dean?

"A. I live at Springhill, Louisiana.

"Q. By whom are you employed?

"A. How is that?

"Q. By whom are you employed?

"A. Pine Woods Lumber Company; motor department.

"Q. Were you ever employed as in charge of the carpenter gang there?

"A. I was rent foreman there for about twenty-six months.

"Q. Rent foreman?

"A. Had charge of the buildings and lights and water department. I looked after the rent collections and such like as that.

"Q. You had charge of the repair and building of the houses?

"A. I did.

"Q. You were general foreman?

"A. I was general foreman of the work.

"Q. Of the carpenters?

"A. There would be some times that I would have to split my gang and at times I would hire three gangs at once, then maybe I would get one of the boys to go ahead with the work.

* * *

"Q. The work on this house was being done for the Pine Woods Lumber Company or for Mr. Giles?

"A. Mr. Giles.

"Q. How did you keep that, what record did you keep of that?

"A. Well—I had a time book in the office, in the time-keeper's office, in which I kept a true record of all work I did. I had to look after all the water and the lights and the house work around there and had a great deal of plumbing done, so by me having charge of the work why the citizens around there would look to me to have all their work done and—

"Q. Go ahead.

"A. And so I was doing this work for Mr. Giles out there. He was away from home. I had a man over there in the camps that needed the house, that I had to give a house; it was our timber man, so Mr. Giles was going away and he asked me to fix up this house over there for him.

\* \* \*

"Q. Now, when you went out there to the Giles job the first day, you say you went along?

"A. The first day we went over there.

"Q. Who was in the party?

"A. Well, I think Mr. White, Mr. Mc-Eachern, and his boy, Mr. McDonald, John Dyer and myself. There was some went in my car, some in the truck and some in other cars, and so when we got there I just made the remark to the boys, 'Now you boys want to be careful out here and none of you get hurt'; I says 'This property belongs to uncle Jim', and of course they knew who I was talking about.

"Q. Who is uncle Jim?

"A. Mr. Giles.

"Q. Did you or not say that to Mr. Mc-Eachern, the plaintiff in this case?

"A. I didn't just personally tell any one; I just spoke to all of the boys; I said that there was no polly on that job.

"Q. No what?

"A. No polly.

"Q. What did you mean?

"A. I meant if any one got hurt he would not get anything for it.

"Q. No compensation.

"A. Yes. We call that polly. They knew what I was talking about.

"Q. Did Mr. McEachern make any objection to going to work when you made that statement?

"A. Not as I know; I don't guess he did.

"Q. Well, did he?

"A. No; no, he didn't.

"Q. Did you ever say anything to him about this being the old man's job?

"A. Sure; they all knew it.

"Q. I am not talking about what they knew; I am asking you about what you told Mr. McEachern?

"A. I told him the second day. I split a bunch of men and was late about getting out there on the second morning, so I told him, I says 'I am taking part of these boys off now', and I says 'You boys rush this job there', I says 'Uncle Jim is gone and let's make a showing when he gets back'. I says 'Take these boys and go after it out there and get it done for me'.

"Q. Was anything said at that time about there being no insurance and about their being careful?

"A. Not that morning; that was the second morning.

"Q. Now, how did you separate or keep separate the work that was done for Mr. Giles and that done for the Pine Woods Lumber Company?

"A. Well, I had a book there in the time-keeper's office that had Mr. Giles' name on it and what place it was; so every fellow's name was right under this place. So this job would be charged to Mr. Giles and we kept it separate as to which place it was being charged to, whatever place it was. Then when I got this job done I totalled the whole amount up and turned the bill in to Mr. Mullens and he turned in Mr. Giles.

"Q. What Mr. Mullens did I don't want you to testify to. It is only what you know, Mr. Dean, that is what I am trying to get at. Did you say anything to Mr. McEachern about this being a private job and to fix it so that the expense would not be too heavy on Mr. Giles.

"A. Sure did.

"Q. What did you say to him?

"A. I told him 'This here job out here belongs to Uncle Jim and let's make a showing out here and get it finished before he gets back'. There was two rooms to put to it and other work around there.

"Q. Who was the straw boss or the foreman on the job out there?

"A. Well, I told him to look after it for me and I also had another one.

"Q. Another what?

"A. I say that I had another straw boss, but it was on another job.

"Q. I mean on this particular job?

"A. He was the one I was looking to for my work.

"Q. He was in charge there?

"A. Yes, sir. I expected him to be, anyway.

"Q. Did you tell him so?

"A. Sure did.

"Q. Well, if you don't remember, all right.

"A. I say yes, I told him, yes, sir.

\* \* \*

"Q. Now, you say that you turned this time to the bookkeeper of the Pine Woods Lumber Company?

"A. I turned it into the time-keeper's office.

"Q. That is the office of the Pine Woods Lumber Company?

"A. Yes, that is where I keep my books.

\* \* \*

"Q. Now, how were you working, on a percentage basis or by the day?

"A. Well, I was working by the month.

"Q. Working by the month.

"A. Yes, sir.

"Q. Then you charged the Pine Woods Lumber Company so much per month for foreman or superintendent of the work that you had in charge and then you charged Mr. Giles for looking after the jobs that he personally had?

"A. No; I charged Mr. Giles up with this work on this job and then the Pine Woods Lumber Company got paid for my services that I turned to Mr. Giles.

"Q. You did not collect, then, any pay from Mr. Giles for the work that you did out there?

"A. Not for myself; he paid the bill for whatever it was that the labor came to.

"Q. Do you know where Mr. McEachern got his pay and how he got it?

"A. At the mill office.

"Q. At the mill office?

"A. Not the mill office; the time-keeper's.

"Q. Time-keeper for the Pine Woods Lumber Company?

"A. Yes, sir.

"Q. He got it in an envelope with the Pine Woods Lumber Company's name stamped on it?

"A. Sure did.

"Q. That is the way that you men got your pay?

"A. No, sir; I didn't.

"Q. The carpenters?

"A. The daily men did, yes, sir.

"Q. Mr. McEachern did not hire to Mr. Giles to do any work?

"A. Did he which? Mr. McEachern was working under any instructions.

"Q. You were working under the instructions of the Pine Woods Lumber Company?

"A. Mr. Giles.

"Q. And he was working under the instructions of the Pine Woods Lumber Company?

"A. He is president, superintendent, manager. I was working for him; I did what he said.

"Q. He is the whole cheese up there, in charge of the thing?

"A. Yes, sir.

\* \* \*

"Q. You are still employed by the Pine Woods Lumber Company?

"A. I am employed by the Pine Woods Lumber Company in the motor department.

"Q. Well, it is all one and the same thing?

"A. Yes.

"Q. Mr. Giles is the head of the whole outfit?

"A. Yes."

J. F. Giles testified, page 75:

"Q. Mr. Giles, in taking the crew from the company's business and putting it on your work, was any notice ever given the men that that was to be done or did you just go ahead and draw the pay rolls through the company?

"A. I never told them to go on with the work; the foreman told them."

From the above evidence we are convinced that plaintiff at the time of the accident had been employed by Mr. Dean, the foreman of the defendant company, to work for said company and that he had not been notified that he was no longer an employee of the defendant company; that he received his pay from the defendant company and was not under the direction of Mr. Giles, but under the direction of Mr. Dean.

Mr. Dean testified, pages 57 and 58:

"Q. Mr. Dean, you say that Mr. McEachern was supposed to be foreman on that job?

"A. He was the man that I was looking to for the work up there when I was away, but when I was there, why, I was boss."

In Erie Ry. Co. vs. Jackson, 91 Atlantic 1035, the court said:

"In order to bring the case within the principle of Delaware, Etc., R. R. Co. vs. Hardy, 59 N. J. Law, 35, 34 Atl. 986, the plaintiff in certiorari must show that the servant has in fact consented to the transfer of his services to the new master and accepted him as his master pro hac vice, and that he has entered upon the service and submitted himself to the direction and control of the new master."

Under the above quoted evidence and law we are convinced that at the time of the accident to and injury of plaintiff he was in the employ of the defendant company.

Defendant contends that plaintiff did not suffer any injury compensable under clause (c) of subsection 1 of section 8 of the Employers' Liability Act; that if entitled to compensation at all it is under clause (a) of the same subsection; and that the evidence shows that since October 1, 1925, he had been earning sixty dollars per month or more as a clerk in a grocery store, and that he was only temporarily totally disabled for nine weeks.

Plaintiff introduced in evidence an x-ray photograph of his body made on September 3, 1926, by Dr. S. C. Barrow, more than a year after the accident, in which picture it can plainly be seen, even by a layman, that the broken end of the eighth rib is not in juxtaposition with the remainder of this rib.

Doctor Barrow testified, page 4:

"Q. I, will ask you to read that picture made on September 3, 1926?
"A. Having the history of the case in mind and remembering that our previous examination did not include the upper ribs, we examined his whole chest and made a film which is number 14984. This film shows an old fracture of the seventh, eighth, ninth and tenth ribs about two inches from the spinal attachment, with good union but slight overlapping. The seventh, eighth and ninth also show fracture about six inches from the spinal attachment, that is, they were fractured twice. The eighth rib shows separation at the point of fracture with no union.
"Q. Doctor, I believe you have testified that rib number eight was not reunited in the picture made on September 3rd?
"A. Yes; the eighth dib shows incomplete union.
"Q. Now, doctor, in a condition of that kind, would there be any pain or suffering now by virtue of those ribs not being unifed?
"A. I would reasonably expect that there would be.
"Q. You think that, why do you think so, doctor?
"A. Because the fracture points are not in apposition; not correctly in line; and that portion of the anatomy is in constant motion with respiration; it is in close proximity to the sensitive nerve, the intercostal nerve, and we would naturally expect some pain.
"Q. It is possible then for it to last a long time?
"A. Yes."

L. L. McEachern testified, pages 12 and 13:

"Q. What is the condition now as to your side in regard to pain? Does it bother you?
"A. When I lift up anything.
"Q. Yes?
"A. When I lift up anything, that is, if there is much weight about it, it hurts me, and I cannot lay on that side or bear my weight on it or press against it.
    *   *   *
"Q. Does it pain you to do any strenuous work?
"A. Well, heavy lifting or something like that, it hurts me."

Mrs. E. A. McEachern testified, pages 31 and 32:

"Q. Do you remember the occasion of

him getting hurt last August, a year ago?
"A. Certainly do.
"Q. Did you go to Shreveport with him?
"A. Yes, sir.
"Q. Do you know how long he stayed over there at the sanitarium?
"A. Stayed there eleven days. .
"Q. Now, since he came back, have you heard him complaining of his ·side hurting him in any way?
"A. Well, he complains at lifting anything heavy or of lying on his left side at night; he cannot lie that way but just a little bit. He will have to turn over after he has been on that side just a little bit.

\* \* \*

"Q. Do you know what inconvenience he suffered after he came back? I mean in regard to having to have help in any way? Whether he was helpless?
"A. He was helpless.
"Q. How long did he remain that way?
"A. Well, it was a good long time, but just how long I could not say. For several months he could not stoop over to lace his shoes. I would put his shoes on for him and pull them off, because as for stooping he could not do it. I don't know just how long it was, but it was a good long time.
"Q. Well, does he suffer any inconvenience in bending to lace his shoes at any time?
"A. Yes, sir; I pull his shoes off for him lots of times now. I lace his shoes and pull them off.
"Q. Did you do that before he was hurt?
"A. No, I never did before."

Under this evidence we are convinced that plaintiff sustained an injury that permanently seriously impaired a physical function, namely, the eighth rib on his left side.

Defendant's counsel argue with much force and earnestness that plaintiff's injury was such as to temporarily totally disable him and that if entitled to recover at all it is under clause (a) of subsection 1 of section 8 of the Workmen's Compensation Act and not under clause (e) of

said subsection as for a permanent serious impairment of a physical function.

We held to the contrary in Matthew Burton vs. Kaucher, Hodges & Co., 3 La. App. 74, where we said:

"An injured employee suing under the Workmen's Compensation Law, Act No. 20 of 1914, section 8, subsection 1 (a) as amended by Act No. 216 of 1924, may recover compensation for and during temporary total disability and after such disability shall have ceased may recover compensation under section. 8 subsection 1 clause (e) of the same act."

In his petition plaintiff only asked for the amount of expenses he had incurred for medical bills and for sixty-five per cent of the amount of wages he had been earning during one hundred weeks and the amounts so claimed have not been contested.

Under the evidence we see no reason for disturbing the judgment of the lower court as to the amount allowed plaintiff.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed.